STATE of Missouri, Respondent,

v.

Larry J. THOMAS, Appellant.

No. 62067.

Supreme Court of Missouri,
Division No. 2.

Dec. 8, 1981.

Rehearing Denied Jan. 12, 1982.

Fred Slough, Kansas City, for appellant.

John Ashcroft, Atty. Gen., John Morris, Asst. Atty. Gen., Jefferson City, for respondent.

JAMES R. REINHARD, Special Judge.

Defendant was convicted of capital murder in the slaying of a Kansas City police officer. The jury assessed punishment at life imprisonment with no possibility of parole for 50 years. Sections 565.001, 565.008 RSMo. 1978.[1] Judgment was entered accordingly. Defendant complains of a spate of errors in the course of his 19 points on appeal. We affirm.

The state's evidence showed the following facts: Defendant was well-known to the police officers working in the area near defendant's home. The slain officer, Officer John O'Sullivan, had arrested defendant three times and had testified against him in court. Defendant called the police to his home numerous times to make complaints. On the day before the crime, December 11, 1978, he made four such calls. On the morning of the murder he called police to complain that someone had stolen one of his dogs. He asked the officers who responded to the call if they knew Officer O'Sullivan, and told them he was going to "get even with that mother fucker if it's the last thing I do."

A short time later on the same morning, a telephone repairman, driving down 68th Street some three blocks from defendant's residence, noticed a black man driving a red Rambler in front of him. The Rambler was identified by license plate number as belonging to defendant. The repairman noticed a Doberman pinscher sitting in the back seat. The Rambler pulled up to Myrtle Street and made a left turn. The repairman was still behind the Rambler, waiting to make a similar left turn on Myrtle. A police car was stopped on Myrtle, and it and the Rambler were now side by side, facing opposite directions. The driver's door of the police car was open. The man in the Rambler said something to the officer in the police car. The officer responded by saying "Wait a minute" to the man in the Rambler. The officer then reached for his radio, and while he was not looking, the man in the Rambler pointed a gun out of

---

1. All statutory references are to RSMo. 1978 unless otherwise indicated.

the window of the car and shot the officer in the side. The man in the Rambler drove away. The repairman got out of his truck, took the microphone out of the dying officer's hand, and broadcast that an officer had just been shot at 68th and Myrtle. The repairman noticed the officer's revolver was still in its holster.

Officer Dresselhaus was one of the officers who had responded to defendant's call earlier that morning. He had heard the threat defendant had made and he had noticed defendant's red Rambler at the house. Officer Dresselhaus was cruising the neighborhood later that morning, just prior to the shooting. Less than two blocks from the scene of the shooting he saw defendant driving his Rambler, and saw the Doberman sitting in the car. Defendant pulled up next to him and spoke. Then, less than a minute after they parted, Dresselhaus heard the repairman announce over the radio that an officer had been shot at 68th and Myrtle. Dresselhaus was only a block away, and he arrived at the scene immediately. Officer O'Sullivan died shortly thereafter.

Officer Dresselhaus later spoke with the repairman and, upon learning the description of the assailant, he issued a "pickup" for defendant. Sergeant Parker (who had also answered the call at defendant's house that morning) heard the description broadcast and went to defendant's house. As he got out of his car defendant leveled a gun at him from inside the front door. Parker jumped back in his car and called for assistance on his radio. The house was soon surrounded and defendant arrested. He was informed of his rights. The murder weapon was found inside the house.

Defendant confessed to the crime, and his confession was transcribed at the police station. At trial, defendant took the stand and denied having been at the scene as well as having confessed to the crime. He said that he had been watching television and talking with his wife and his mother.

## I.

Defendant contends that he had the right to defend himself and to resist an unlawful arrest and that therefore instructions concerning these defenses should have been given. Even though defendant testified that he was not at the scene, he argues that his confessions, used by the state at trial, contain statements which support these defenses.[2]

Defendant confessed to Officer Connor, who rode with him to the station in the paddy wagon. Defendant told Connor that he had lost one of his dogs and had reported it stolen to the police, but that he later found it. He was out driving that morning and saw a police car (apparently that driven by Officer Dresselhaus) and went to catch the police car to tell the officer that he had found the dog. Before he caught up with the car, it turned. He continued on and saw Officer O'Sullivan sitting in his patrol car at 68th and Myrtle. He recognized O'Sullivan and as he turned the corner, he rolled down his window and yelled at the officer that he found his dog. As he drove past the officer he noticed O'Sullivan had a revolver under his leg. Defendant then pulled out his gun and waved it at O'Sullivan. At that time the officer stated that defendant was under arrest. Defendant did not understand the reason he was under arrest. The officer began to get out of his car; when his feet touched the ground, defendant noticed a gun on his lap. Defendant decided he had to kill the officer or be killed so he fired.

When defendant arrived at the station he went over the story again and this time it was transcribed by a stenographer. Defendant refused to sign the transcription. What follows is the pertinent part of the transcription which the state introduced at the trial:

I had rolled down my window and was waving my hand at Officer O'Sullivan so

2. Defendant submitted a self-defense instruction, which was refused, but he did not offer an instruction concerning the unlawfulness of the arrest. Nevertheless, former Rule 26.02(6) effective on the date of trial, required the court to "instruct the jury in writing upon all questions of law necessary for their guidance in returning their verdict" whether the instructions were requested or not. See present Rule 28.02.

I could tell him that I had found my dogs. I drove just past where Officer O'Sullivan was sitting and yelled to him that I had found my dogs, that everything was okay. Officer O'Sullivan told me he didn't know anything about any dogs so I started to back up to him. The officer told me not to back up, to stay where I was at and he would come to me. I went ahead and backed up to where my back bumper was about a car length from his back bumper. I could see Officer O'Sullivan was backing up. He stopped his police car almost directly across from me. I told him again that everything was okay and I waved at him again. I could see the officer's police car door open and the officer turned in the seat and I saw both of his feet touch the ground and as he turned I could see that he had his pistol in his right hand on his lap. I could see the riot gun and the police radio in his car as the officer got out of the car. The officer pointed his gun at me and said to me, "come here". At that time I took my pistol out from under my right leg, holding the pistol in my right hand, I rolled my window down the rest of the way and showed the officer my gun, telling him that everything was all right. The officer was standing almost directly beside me. His gun was pointing at my head and *the officer then told me I was under arrest.* I asked the officer why and he said something like, you're going to jail. I asked him for what and the officer then put both hands on his gun at which time I put my car into gear and layed down in the seat. As I was starting to pull away I looked up in my rearview mirror and I could see the officer pointing his gun at me, standing almost directly along the left side of my car. The officer was squatting with both hands on his gun and his arms were out straight. *At that time I decided I was either going to have to kill him or he was going to kill me.* I then stuck my right hand out the window and bent my arm back over to my left shoulder. I turned in the seat to see

where the officer was standing, pointed my gun at him and fired one shot. (emphasis ours)

Defendant contends the jury should have been instructed to make a finding on whether the attempted arrest was lawful or unlawful. He argues that if the jury found the arrest to have been unlawful he could be found guilty of, at most, manslaughter. Although this point was not raised in defendant's Motion for New Trial we have considered it and find it to be without merit.

At common law one had the right to resist an unlawful arrest with as much force as was necessary to prevent the arrest. *State v. McGehee,* 308 Mo. 560, 274 S.W. 70, 72 (1925); *State v. Browers,* 356 Mo. 1195, 205 S.W.2d 721, 722–23 (1947); Annot. 44 A.L.R.3d 1078 (1972). This right would not, by itself, "furnish a complete excuse for slaying the aggressor," *State v. Messley,* 366 S.W.2d 390, 394 (Mo.1963), but would reduce the offense from murder to manslaughter. *Id.* at 395; *State v. Burnett,* 354 Mo. 45, 188 S.W.2d 51, 53–54 (1945).

■■■ This legal principle is no longer viable in Missouri. In 1965 the Missouri General Assembly passed S.B. 190, codified as Section 557.215 RSMo.Supp.1965, which made it a crime to wound an officer "while such officer is actively engaged in the performance of duties imposed upon him by law." It proved to be no defense to prosecution under this statute that the officer was making an arrest without probable cause to do so. *State v. Rodriguez,* 484 S.W.2d 203, 206–207 (Mo.1972); *State v. Bradley,* 515 S.W.2d 826, 828–29 (Mo.App. 1974); *See also State v. Brothers,* 445 S.W.2d 308, 310 n.1 (Mo.1969). Nor was it a defense that the law which defendant was arrested for violating was found to be unconstitutional. *State v. Briggs,* 435 S.W.2d 361, 365 (Mo.1968). Hence under Section 557.215 RSMo.1969 an arrestee no longer enjoyed a right to resist an unlawful arrest by a known police officer.[3] Defendant had

---

**3.** Section 557.215 has been repealed and Section 575.150 RSMo.1978 substituted in its

stead. This was not yet effective, however, on

no such right,[4] and so his resistance cannot be condoned by reducing the degree of the resulting offense. *See People v. Roman*, 256 Cal.App.2d 656, 64 Cal.Rptr. 268, 271 (1967).

Defendant next contends the court erred in refusing to give an instruction on self-defense. An instruction on self-defense must be given when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony. *State v. Wright*, 352 Mo. 66, 175 S.W.2d 866, 872 (banc 1943); *State v. Adkins*, 537 S.W.2d 246, 249 (Mo. App.1976). In examining the record for evidence supporting the theory of self-defense, we consider the evidence in the light most favorable to defendant. *State v. Cole*, 377 S.W.2d 306, 307 (Mo.1964).

We note at the outset the difference between resisting arrest and defending oneself against excessive force used in effecting the arrest. As stated in *State v. Nunes*, 546 S.W.2d 759 (Mo.App.1977), "the jurisdictions which have abrogated the common law right to resist an unlawful arrest recognize that the right of self-defense against excessive force remains unimpaired." *Id.* at 762. An officer is expected to be the aggressor, and is not to be "placed on the same level as ordinary individuals having a private quarrel" or "denied that protection commensurate with the public duty exacted." *State v. Nolan*, 354 Mo. 980, 192 S.W.2d 1016, 1020 (1946). If, after announcing his intention to arrest, the officer encounters flight or resistance he is bound by Section 544.190 to use "all necessary means to effect the arrest." Conversely, he is prohibited from using any more force than is necessary to effect the arrest; his doing so will constitute an assault, *See Manson v. Wabash Railroad Company*, 338 S.W.2d 54, 61 (Mo.banc 1960); *State ex rel. Donelon v. Deuser*, 345 Mo. 628, 134 S.W.2d 132, 135 (1939), and generates the right of

the arrestee to defend himself against the excess. This right is a last resort, however. Defendant must have done all he can, consistent with his own safety, to avert the necessity. *State v. Jackson*, 522 S.W.2d 317, 319 (Mo.App.1975). Hence, it is said "the arrestee forfeits his right to self-defense if he knows that if he desists from physical resistance and submits to arrest, the excessive force will cease." *State v. Nunes*, 546 S.W.2d at 763.

Under these principles, it is apparent that to merit an instruction on self-defense during an arrest substantial evidence must be introduced to support a finding that the officer was using excessive force, i.e., more force than was necessary to effect the arrest, and that the defendant reasonably believed that forceful resistance was the only means by which he could protect himself against that excess.

We held in *Manson v. Wabash Railroad Company*, 338 S.W.2d 54, that evidence that a security officer pointed his gun at two teenage suspects and told them he would shoot if they ran did not make a submissible case on the issue of use of excessive force in the course of an arrest. 338 S.W.2d at 61. The case was a civil one and the cause of action was assault, but the issue was the same: whether there was enough evidence to support a finding that the officer used excessive force, more force than was necessary to effect the arrest. We held there was not and stated the following:

> [T]he officer in the first instance is the judge of the manner and means to be taken in making an arrest. Unless a plaintiff can show that unnecessary force was used, courts will protect the officer. As a rule, the question of unnecessary force in such cases is a question for a jury. But, there must be evidence to sustain a finding of such force and if no such evidence is present, courts will not

---

the date of the crime involved here. Section 575.150.3 RSMo.1978 specifically states that "[i]t is no defense to a prosecution under subsection 1 of this section that the law enforce-ment officer was acting unlawfully in making the arrest."

**4.** We do not hold that the arrest was unlawful; our conclusion makes that inquiry unnecessary.

permit a judgment against the officer to stand.

*Id.* (citations omitted).

■ The trial court properly determined as a matter of law that defendant was not entitled to an instruction on self-defense. We agree with the trial court's determination because the facts as stated in the confessions do not support a finding that excessive force was used. The officer was confronted with a person he had arrested three times before and who had reason to bear a grudge, driving past him, shouting. The officer ordered him to stay where he was, but defendant ignored him and backed up toward him. The officer then drew his gun and ordered defendant to "come here." Defendant, instead of obeying, produced a gun of his own, and began to flee the arrest.

Under the law these facts do not constitute evidence of excessive force. Defendant stated that as he was escaping he felt it necessary to kill the officer in order to prevent the officer from killing him. It is not the defendant's subjective belief, however, that determines whether a self-defense instruction is required; rather, the facts must reveal that excessive force was used and that defendant reasonably believed that force was the only means by which he could protect himself against the excessive force. Under these facts no such conclusion is possible.

## II.

Defendant contends he was denied effective assistance of counsel in that his attorney "did not call witnesses and cross examine witnesses for the purpose of proving the defendant's irrational, fearful, paranoid state of mind at the times surrounding the killing, to prove an insanity defense, or, to reduce the degree of the offense." Defense counsel requested and was granted two psychiatric evaluations prior to trial. The reports on defendant indicated that there was no evidence of psychosis or any mental disorder or defect, that defendant had the capacity to understand the proceedings against him and assist in his own defense, that he knew the nature, quality and wrongfulness of his actions, and that he was capable of conforming his conduct to the requirements of the law.

Immediately prior to commencement of trial, defendant's counsel informed the court of a conflict between himself and his client. He said he thought the evidence against defendant was overwhelming and he felt defendant's best chance would be to try to establish that he acted in a state of "paranoia," and was not capable of the cool reflection required for capital murder. Defendant's counsel stated that he had discussed this with defendant, but defendant refused to allow his attorney to call witnesses to establish his paranoid condition. Counsel stated that defendant insisted his defense would consist of a denial that he committed the offense.

Defendant was present when his attorney made this record and he indicated to the court that such was his decision. Defendant's counsel made a similar record after the state rested its case, and again prior to the sentencing phase of the trial. Each time defendant indicated that it was his decision not to proceed on a defense of mental incapacity.

Defendant now contends that, notwithstanding his refusal prior to trial, his attorney should have called witnesses to establish that he was a long time drug abuser, that he was afraid somebody was going to kill him and his family, that the police officers considered him a "mental" and that he was often heard "talking crazy."

■ To prevail on a claim of ineffective assistance of counsel, defendant must show that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances, and that prejudice resulted. *Seales v. State*, 580 S.W.2d 733, 736 (Mo.banc 1979).

■ It is not a breach of this standard for the attorney, after fully informing his client, to accede to his client's demands, even if the attorney feels the choice is unwise. The Code of Professional Responsibility, Rule 4, E.C. 7–7 states:

In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions of his own. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on his lawyer.

While a defendant has a Sixth Amendment right to effective assistance of counsel, he may not be forced to accept this assistance if his decision to represent himself is informed and voluntary. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Similarly, he may not be forced to accept major decisions of trial strategy if he is fully informed and voluntarily decides not to follow the advice of his lawyer. It would be absurd to say that a defendant may waive the assistance of counsel entirely and yet may not waive the benefit of counsel's advice with respect to a particular decision, such as whether or not to assert a particular defense. The Court in *Faretta* stated that the Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Id.* at 820, 95 S.Ct. at 2533.

Defendant's attorney wisely made a record concerning this dispute and the trial judge allowed the trial to proceed. On the basis of the psychiatric reports, both counsel and the trial judge had every reason to believe that defendant was fully competent to make the decision. Defendant's choice may have been unwise, but this does not impeach the competency of counsel who advised against it. The failure of a strategy knowingly and voluntarily pursued by defendant does not entitle him to another try under the guise of ineffective assistance of counsel. *See Thomas v. State*, 475 S.W.2d 98 (Mo.1971).

Defense counsel did offer an instruction on mental disease or defect based upon MAI–CR2d 2.33, which was refused. Defendant contends the court erred in refusing the instruction. Defendant's argument recites the facts on which the offer of the instruction was based: When the police responded to defendant's call on December 11, he became hostile and angry with them. He said the officers had a bad attitude, and he became angry at one of them for talking to his wife. He was afraid of Officer O'Sullivan and thought that O'Sullivan was conspiring to have defendant arrested. He was hostile to the officers who responded to the call on the morning of the murder, and threatened Officer O'Sullivan's life. Then, after the shooting and before the arrest, defendant saw firemen trying to set his house on fire. Lastly, "defendant confessed to facts which had not occurred."

A person is presumed to be free of such mental disease or defect as will preclude responsibility. § 552.030 RSMo. This presumption is conclusive unless substantial evidence is introduced that defendant lacks responsibility. *Id.; State v. Olinger*, 396 S.W.2d 617, 620 (Mo.1965); *State v. Vansandts*, 540 S.W.2d 192, 204–205 (Mo. App.1976). The evidence relied on by defendant, summarized above, is not substantial evidence of a mental defect, but is only evidence of hostility and antagonism which defendant felt toward the police, and specifically toward the victim. Furthermore, the disparity between the facts as told by defendant and those told by other witnesses is not such as supports the assertion that defendant has a mental defect. Defendant's point is denied.

### III.

Defendant makes a number of contentions concerning the pre-trial stage of the proceedings. Defendant was originally indicted in Jackson County on December 15, 1978. A motion for a change of venue was granted and the case was transferred to St. Louis County.

Defendant was re-indicted on February 9, 1979 in Jackson County and the state dismissed the first indictment, pending in St. Louis County. This was done because of certain technical defects in the first indictment. Defendant again moved for a change of venue but this time it was denied.

On appeal, defendant contends (1) that the Jackson County Circuit Court had no jurisdiction because "jurisdiction and venue of the cause had previously been changed to St. Louis County" and (2) that if the court had jurisdiction, it was bound by the doctrine of collateral estoppel to grant the second motion for a change of venue. Defendant admits that neither argument has merit under Missouri law, but presses for a change in the law to support his contentions. We decline the invitation. The pendency of one indictment is no bar to a second for the same offense, *State v. Berry*, 298 S.W.2d 429, 432 (Mo.1957), and upon issuance of a second, the first is "deemed to be suspended by such second indictment, and shall be quashed." § 545.-110 RSMo. The grant of a change of venue in the first proceeding had no effect on the ability of the grand jury to re-indict defendant and no effect on the jurisdiction of the court over the second proceeding. *State v. Goddard*, 162 Mo. 198, 62 S.W. 697, 704 (1901); *State v. Patterson*, 73 Mo. 695 (1881). Collateral estoppel has no application because the doctrine applies only to determinations of ultimate fact by a valid and final judgment. *State v. Johnson*, 485 S.W.2d 106, 112 (Mo.1972). Furthermore, the doctrine only applies when the issue determined is the same as the issue in the pending case; here the original grant of a change in venue did not decide whether a fair trial could be obtained in Jackson County at the time of the second motion. *See U. S. v. Holder*, 399 F.Supp. 220, 227 (W.D.S.D.1975).

Defendant also contends that, after his first indictment, his "rights to counsel, to compulsory process and to confrontation and cross examination" had attached, and that he was denied these rights when the grand jury re-indicted him "without notice." This contention likewise lacks support in the law. We held in *State v. Tressler*, 503 S.W.2d 13 (Mo.1973) *cert. denied* 416 U.S. 973, 94 S.Ct. 2000, 40 L.Ed.2d 563 (1974) that one's constitutional rights are not violated by grand jury indictment. The second indictment began a new and separate criminal proceeding to which *Tressler* applies to deny defendant's contention.

Defendant also complains that he was denied his right to a speedy trial. The time which elapsed between his arrest and the trial was less than twelve months. Defendant moved for two psychiatric evaluations, one on February 22, 1979 and the other on June 14, 1979. These were granted and defendant was examined. The first report was completed May 30. The second report was completed September 28 and a hearing set for October 29 to determine defendant's fitness to proceed. On the basis of the reports he was found fit to proceed and a trial date of December 3 was set. Hence the only delay not occasioned by defendant's own motions consisted of less than four months. (December 12—February 22; October 29—December 3).

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). Considering the seriousness of the crime involved, a delay of less than four months is not "presumptively prejudicial." [5]

Defendant challenges the sufficiency of the indictment.[6] Defendant contends that

---

5. Defendant does not base his contention on § 545.780 RSMo., which requires the state to bring a defendant to trial within 180 days after arraignment. Nevertheless we note that the periods of time spent examining defendant pursuant to his motions for psychiatric evaluation are not included in computing the 180 days. § 545.780.3(1)(a); *State v. Richmond*, 611 S.W.2d 351, 353 (Mo.App.1980).

6. The indictment charged that defendant "did then and there unlawfully, wilfully, knowingly, feloniously, deliberately and with premeditation, and of his malice aforethought, ... make an assault in and upon one John O'Sullivan, with a dangerous and deadly weapon, to-wit: a .38 caliber pistol, loaded with gunpowder and leaden balls, then and there inflicting upon the said John O'Sullivan a mortal wound, and that from said mortal wound the said John O'Sullivan, within one year thereafter, to-wit: on the

the indictment only alleged that the assault was intentional and did not allege that the killing was intentional. He contends that this fails to charge the crime of capital murder under the new capital murder statute, § 565.001 RSMo.

Intent is an element of the crime of capital murder under § 565.001 RSMo. required by the use of the word "willfully." [7] See State v. Marston, 479 S.W.2d 481 (Mo. 1972). This section does not however, require an allegation of a specific intent to kill. In this it is similar to the former first degree murder statute, § 559.010 RSMo. 1969; See Patrick v. State, 460 S.W.2d 693, 699 (Mo.1970).

The sufficiency of an indictment is tested by inquiring "whether or not it states the essential elements of the offense charged so that the defendant is adequately informed of the charge against him and the final disposition of the charge will constitute a bar to further prosecution for the same offense." State v. Downs, 593 S.W.2d 535, 540 (Mo.1980). While a form which more closely follows the statutory language would be preferable, the form used here has been held to be sufficient several times, Clark v. State, 497 S.W.2d 170, 174 (Mo. 1973); Patrick v. State, 460 S.W.2d at 698–699; State v. Floyd, 403 S.W.2d 613, 615 (Mo.1966). We find that it sufficiently stated the elements of capital murder under § 565.001 RSMo.

## IV.

Defendant next engages the Missouri homicide statutes in several brief skirmishes. First, he contends his sentence of life imprisonment constitutes cruel and unusual punishment. This contention was rejected in State v. Higgins, 592 S.W.2d 151, 155–56 (Mo.banc 1979) appeal dismissed 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980).

Next, defendant contends certain provisions of Chapter 565 are unconstitutionally vague. Four provisions so assailed are found listed in the aggravating and mitigating circumstances under § 565.012. These will not be considered because defendant was given the lesser of the two possible sentences for the crime of capital murder. Hence any vagueness did not prejudice him. The remaining words and phrases challenged are: "unlawfully, willfully, knowingly, deliberately, and with premeditation" (§ 565.001), "without a premeditated intent" (§ 565.003), "culpable negligence" (§ 565.005) and "probation or parole" (§ 565.008).

The prohibition against vagueness was discussed in Matter of Trapp, 593 S.W.2d 193, 202 (Mo.banc 1980): "A statute violates the due process clause of the fourteenth amendment when it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" This aspect of the vagueness doctrine is essentially concerned that "[v]ague laws may trap the innocent by not providing fair warning." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

To argue that a statute making it a crime to "unlawfully, willfully, knowingly, deliberately, and with premeditation [kill] or [cause] the killing of another human being" provides a trap for the innocent is ludicrous. Section 565.003 simply deletes premeditation. "Culpable negligence" as used in § 565.005 means "negligence of such reckless or wanton character as to indicate an utter indifference to the life of another." State v. Cheek, 413 S.W.2d 231, 238 (Mo. 1967). A person of common intelligence would have no trouble in deciding how to act so as not to run afoul of such a standard. The last phrase at which defendant's vagueness attack is directed, "probation and parole" § 565.008.1, does not concern the

12th day of December, 1978 at the County of Jackson and State of Missouri, died."

**7.** Section 565.001 RSMo. provides: "[a]ny person who unlawfully, willfully, knowingly, delib-

erately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder."

action of the defendant which constitutes the crime. Defendant has failed to explain how any of these sections might confuse a man of common intelligence, and frustrate his attempts to conform his conduct to the law. The points are ruled against defendant.

 Defendant next contends the Missouri statutes are unconstitutional in that they give the prosecutor, the jury, and the Governor unbridled discretion in determining the guilt and sentence of the accused. This contention does not merit discussion because it has been rejected by the U.S. Supreme Court. *See Jurek v. Texas*, 428 U.S. 262, 274–75, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976). It suffices to say that adequate standards are provided to guide the decision to impose punishment. § 565.-012 RSMo.; *See Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976).

 Defendant next argues that the Missouri homicide statutes violate the guarantee of equal protection in that they allow different punishments for the same crime and allow racial discrimination to influence the sentence. The Equal Protection Clause does not deprive the legislature the power to classify crimes but only requires that the classification have some reasonable basis. *State v. Mitchell*, 563 S.W.2d 18, 23 (Mo. banc 1978). We do not apply any greater scrutiny because defendant does not contend that the exercise of a fundamental right is being punished, or that the classifications are in any way suspect.

The degrees of murder in our statutes are premised on distinctions which provide a reasonable basis for the different classifications and punishments. Defendant's contention that racial discrimination is allowed to control the destiny of the accused ignores our conclusion that adequate standards are provided in the statutory scheme.

### V.

Defendant makes two allegations of error concerning voir dire.

 Defendant contends the court erred in excluding certain veniremen from the jury panel who did not state unequivocally that they could not impose the death penalty under any circumstances. There is no need to belabor this opinion with an analysis of the transcript; defendant did not receive the death penalty and hence cannot raise this objection. *State v. Borden*, 605 S.W.2d 88, 92 (Mo.banc 1980).

Defendant also contends he was denied a fair trial when the prosecutor mentioned during voir dire that the alternative to the death penalty for one convicted of capital murder is life imprisonment with no possibility of parole for fifty years. No objection was made and the matter was not raised in the Motion for New Trial. Defendant now objects to the mention of the impossibility of parole.

 While it is clear that "the question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury," *State v. Rollins*, 449 S.W.2d 585, 591 (Mo.1970) *cert. denied* 399 U.S. 915, 90 S.Ct. 2220, 26 L.Ed.2d 573 (1970), we find no prejudice to defendant in the remark and certainly no manifest injustice. Rule 84.13(c).

### VI.

 Defendant raises a number of points concerning the evidence. He contends the confessions which the state introduced at trial were involuntary, and that the court erred in overruling his motion to suppress. While the burden is on the state to prove that in-custody statements were voluntarily made, *State v. Olds*, 569 S.W.2d 745, 751 (Mo.banc 1978), our review is limited to whether the finding of the trial court is supported by substantial evidence. *State v. Higgins*, 592 S.W.2d at 158.

Defendant's motion alleged that his confession was obtained by trick, false promises, threats, physical coercion, and duress. The evidence amply supports the conclusion that none of these was used to procure the confession. Two officers testified at the suppression hearing. Defendant did not. The officer who accompanied defendant to

the station and who took the confession testified that defendant was read his rights before entering the paddy wagon, immediately afterwards, and a third time upon reaching the station. Neither officer testified to any abuse of defendant. Defendant talked rationally and showed no signs of being under the influence of drugs. He was nervous, but not abnormally so. He was given cigarettes and coffee at the station. Defendant's point is denied.

In addition to making his confession, defendant signed a consent to search while at the police station. The form was read to him before he signed and was given to him to examine. The evidence supports the finding that consent was voluntarily given; hence defendant's contention that the court erred in overruling his motion to suppress the evidence which resulted from the search is likewise denied.

Defendant contends that the court erred in allowing to be admitted into evidence a .45 caliber handgun, a holster, a .410 shotgun shell, a bag of shells, and a board with a bullet hole in it, as well as testimony about these items. Defendant contends they were irrelevant and prejudicial.

The handgun was identified as the one which defendant pointed at Officer Parker when he first arrived at defendant's house. The gun could shot either a .45 caliber shell or a .410 shotgun shell. Defendant admitted that the gun "went off" once while inside the house before his surrender. Hence the gun and evidence of its use were relevant as showing resistance to arrest and consciousness of guilt. *State v. Kilgore*, 447 S.W.2d 544, 547 (Mo.1969).

Defendant's last challenge goes to the sufficiency of the evidence to prove deliberation. We find substantial evidence of deliberation. Officer O'Sullivan had testified against defendant recently, and defendant threatened to "get even." Defendant was hostile toward the police. He pulled up next to the officer's car, words were spoken, and when the officer turned to talk on his radio, defendant pointed a gun at him and fired. This evidence supports a finding that defendant thought about the action in advance, and acted of his free will, not under the influence of a "violent passion suddenly aroused by some provocation." *State v. Ingram*, 607 S.W.2d 438, 443 (Mo.1980).

Judgment affirmed.

WELLIVER, P. J., HIGGINS and SEILER, JJ., and HODGE, Special Judge, concur.