**Wilbur D. POLSON, Plaintiff,**

v.

**CITY OF LEE'S SUMMIT, et al., Defendants.**

**No. 78–0503–CV–W–4–6.**

United States District Court,
W. D. Missouri, W. D.

March 26, 1982.

Edmund R. Lipowicz, II, Independence, Mo. and Robert K. Ball, II, Kansas City, Mo., for plaintiff.

Pieter A. Brower, Field, Grenty, Benjamin & Robertson, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ON FOURTH AMENDMENT CLAIM AND IN FAVOR OF DEFENDANTS ON SHOOTING INCIDENT

SACHS, District Judge.

This case, tried to the Court, involves a claim by Wilbur D. Polson against the city of Lee's Summit, Missouri, and former policeman Michael Jackson. It is concluded that Jackson entered Polson's townhouse without a warrant, and without consent, at the conclusion of a loud party at which marijuana was smoked, that Jackson discovered several marijuana plants being grown by a co-tenant of Polson's, and thereafter shot and injured Polson in a struggle which began when Polson fled with the plants and then returned to try to disarm Jackson. The facts are in serious dispute, are somewhat difficult to unravel, and the Court is unable to credit portions of the testimony of both principals. The following facts are found by the Court:

1. Officer Michael Jackson went to 3721 Colonial Drive, Lee's Summit, Missouri before midnight on July 30, 1976 in response to the Lee's Summit police dispatcher's notification of a complaint concerning a loud party. The complaint was made by Sari Pershing, who lived at 3727 Colonial Drive.

2. Officer Jackson talked to plaintiff Wilbur Polson on this first visit to 3721 Colonial Drive, during which conversation Polson told Jackson he lived at that address and also that he would quiet the party down. Jackson was not belligerent or obnoxious during this visit. No harsh words were exchanged and Jackson left.

3. A loud party was in progress at the time of this first visit.

4. As many as half of the people attending the party were smoking marijuana. Some of the marijuana was smoked inside the townhouse. The marijuana smoking began about 8:30 p.m.

5. After midnight on July 31, 1976, Officer Michael Jackson again responded to 3721 Colonial Drive, Lee's Summit, Missouri after receiving notice from the dispatcher of another loud party complaint at that address.

6. Officer Jackson requested a back-up for his second visit to 3721 Colonial Drive and reserve officer Shelby Norton responded to the scene with Jackson.

7. Officers Jackson and Norton observed several males standing around a vehicle on the west side of Colonial Drive as they drove south on Colonial Drive, and Officer Norton stayed with those persons while Officer Jackson went to the front door at 3721 Colonial Drive. The stereo was still audible. Most of the guests had left. Only one is known to have remained, outside the group at the street.

8. Officer Jackson announced "police officer" and knocked several times at the front door and, while standing there, smelled what he believed to be marijuana

smoke. While standing at the front door, Officer Jackson was approached by plaintiff Wilbur Polson.

9. Jackson asked to enter the premises, probably asserting the need to turn down the stereo. Polson was "obstinate," probably asking Jackson if he had a search warrant. Polson did not audibly consent to Jackson's entry on the premises, but did not physically resist entrance.

10. As Jackson and Polson stepped inside the entrance to the townhouse, David Danforth followed. Jackson directed Danforth to leave. Polson walked up a flight of stairs to the living room where the stereo was located and turned down the volume. Jackson went up the stairs and into the living room without express or implied permission. The undisclosed purpose of the entry was to look for evidence of drug use.

11. Once inside the living room, Jackson detected a strong odor of marijuana. Jackson did not open any drawers or pick anything up in the living room. There was no physical contact between Jackson and Polson in the living room.

12. Jackson walked through the premises, looking for marijuana or other signs of drugs. He observed marijuana plants in the south window of the kitchen.

13. Polson objected to Jackson's search of the premises and Jackson told him to "shut up." Jackson and Polson entered the kitchen area. Jackson determined the plants were marijuana, took them from the window and placed them on the kitchen counter.

14. Jackson told Polson that he was "busted" (under arrest). At that time, David Danforth opened the sliding glass door next to the kitchen counter from the outside and started to come in.

15. Polson understood he was being arrested for possession of marijuana when Jackson told him he was busted.

16. Polson grabbed the marijuana plants and ran away from Jackson because he did not want to be arrested for possession of marijuana.

17. Polson grabbed the marijuana plants and ran out through the open sliding glass door onto the patio.

18. Jackson gave pursuit, striking Polson in the back with a flashlight, probably demanding that Polson halt. Polson, however, continued to run across the patio and out through a wooden gate into a dark area.

19. Jackson ran to the gate and Polson then stopped in the dark area beyond the fence, set the plants down, turned around and came back toward Jackson.

20. The area beyond the patio and gate was dark. Jackson probably ordered Polson to halt and then drew his pistol.

21. As Polson returned through the gate and reached the patio, Jackson could see that Polson had no weapons in his hands and was no longer holding the plants.

22. Polson lunged toward Jackson and grabbed Jackson's arm, reaching for the pistol.

23. It is unclear what motivation Polson may have had. He was somewhat affected by beer-drinking, marijuana and "mini-whites." He may have been fearful, but more likely was recklessly angered by the intrusion and the show of force.

24. The two men wrestled. Both men fell to the ground, Polson on top of Jackson.

25. Polson was holding Jackson's arms.

26. While both men were wrestling to gain control of the pistol, Jackson fired the pistol. Neither man was hit by this shot, which most likely was a warning shot.

27. Jackson probably told Polson to let go of the weapon several times as the men struggled for control of the weapon. After the first shot was fired and before Polson had effectively surrendered, Jackson pointed the barrel toward Polson's left side and pulled the trigger. There is no evidence the shot was fired in anger. Jackson was apparently in fear of further attack from Polson, or considered this to be the only way to regain control. Jackson had not previously been involved in a shooting and probably misjudged the need to shoot, although the sight of the weapon had not

**558**

subdued Polson and there is no reason to believe Jackson could otherwise subdue him.

28. Polson had been smoking marijuana during the course of the party that evening.

29. Polson had consumed "four hits of mini-whites" (amphetamines) during the party.

30. Polson had consumed at least eight cups of beer of eight ounces each during the party that evening.

31. After Polson was shot, he rolled onto his back. Jackson radioed the dispatcher and requested an ambulance.

32. A marijuana cigarette was taken from the premises by the Lee's Summit police officers investigating the shooting.

33. The marijuana plants taken from the kitchen counter by Polson were found in the dark area beyond the patio.

34. The back of Officer Jackson's uniform shirt was soiled and grass stained.

The foregoing findings are reasonably close to the proposals submitted by defendants, except with regard to the warrantless entry. Plaintiff's suggested findings are either consistent with the above, are immaterial, or are rejected, except that the Court does find that (1) on Jackson's second arrival at the town house, the party had broken up and the premises were for the most part deserted, but the stereo was probably operating, and (2) in accordance with plaintiff's proposed findings 13 and 14, there is no physical evidence supporting the theory that the shot was at very close range. With respect to the injuries, it appears that plaintiff has made a good recovery from surgery and is unlikely to suffer possible future complications in his physical condition.

The legal issues which must be dealt with are: (1) the responsibility of the city of Lee's Summit for the actions of Jackson; (2) whether the warrantless entry was justified by (a) consent or (b) the "plain smell" doctrine; (3) if not, whether nominal damages or compensatory damages are recoverable for the Fourth Amendment violation; and (4) whether Jackson's shot was privileged as a matter of constitutional law and

Missouri tort law by reason of his profession, his motive, and Polson's conduct, or whether, under the circumstances, there was liability for the use of excessive force.

■ Under the Federal Civil Rights Act (42 U.S.C. § 1983), Lee's Summit cannot be held liable simply because it employed a policeman who made a mistake in carrying out his duties. Respondeat superior does not apply in this context, and plaintiff has failed to establish any policy or custom which would make the municipality liable. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). With respect to common law torts, there has been a waiver of sovereign immunity, by reason of the enactment of § 71.185, RSMo. *Newson v. City of Kansas City*, 606 S.W.2d 487 (Mo.App.1980). The waiver of sovereign immunity does not necessarily change the prior Missouri law declining to apply the rule of respondeat superior in a governmental context. *Connelly v. City of Sedalia*, 222 Mo.App. 109, 2 S.W.2d 632, 633 (1928). While the Missouri courts might be persuaded to apply respondeat superior at this time, this Court is not inclined to force Missouri law beyond its present stage, and in any event there seems no practical significance in that both the former policeman and the city are joined in this litigation. The claims against the city should therefore be dismissed.

Jackson's warrantless entry was effected over protest or some form of "obstinate" behavior acknowledged by Jackson. At best, Jackson seems to have gained entry by reason of his official status and no real consent can be inferred. Jackson's strong desire to get into the town house in order to look for marijuana weighs against his contention that he made a polite, noncoercive request to step inside. A Fourth Amendment violation must be found, unless the odor of marijuana smoke could somehow legitimately carry Jackson across the threshold of the town house.

■ It is argued that the "plain smell" of marijuana smoke supplied both probable

cause to enter and search and exigent circumstances avoiding the need for a search warrant. Defendants' citation most nearly in point is *United States v. Curran,* 498 F.2d 30 (9th Cir. 1974), where a warrantless search was permitted because (1) the odor of a significant amount of marijuana, then in the process of being distributed, supplied probable cause, and (2) a "siege" of the premises while awaiting a warrant, probably discoverable by the occupants, would have presented an intolerable opportunity for destruction of the marijuana. The Court stated, however, that "in addition" to probable cause based, in part, on the odor of marijuana, the officer "would have to justify entering the house without obtaining a warrant." l.c. 33.

There is no evidence in this case suggesting that the live marijuana plants may have had a strong, distinctive odor. While there are a number of cases indicating that a supply of marijuana has odor, which may be a factor establishing probable cause, no authority has been cited to establish that the odor of marijuana smoke provides both probable cause *and* exigent circumstances (since burning involves destruction of "evidence") for a warrantless search. *Compare Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (warrant needed when officer smells burning opium). It would seem that Fourth Amendment privacy interests have been given priority over the law enforcement interest in rooting out, arresting and punishing marijuana smokers. In any event, the cases do not allow the odor of burning marijuana to serve in place of a search warrant. *State v. Schur* 217 Kan. 741, 538 P.2d 689 (1975); *State v. Dorson,* 62 Haw. 377, 615 P.2d 740 (1980). A practical explanation would appear to be noted in an Eighth Circuit ruling that the gravity of the offense is a factor to be considered in weighing Fourth Amendment interests against law enforcement interests. *United States v. Williams,* 604 F.2d 1102, 1122 (8th Cir. 1979). Whatever the reason, it cannot be ruled on the basis of existing authorities that marijuana smoke itself invites warrantless searches.

■ Having found a Fourth Amendment violation by Jackson, the remaining issue is damages. In decisions last year, it was emphasized by the Eighth Circuit that a violation of constitutional rights warrants imposition of compensatory damages for the constitutional violation itself, irrespective of more tangible losses. *Villanueva v. George,* 659 F.2d 851 (8th Cir. 1981). Very recent authority, however, specifies the imposition of nominal damages only for a Fourth Amendment violation at least as offensive and unjustifiable as that here involved. *Hunter v. Auger,* 672 F.2d 668 (8th Cir. 1982) (visual body search of visitors at a penitentiary). The Court explained, however, that the claimants' "fourth amendment rights are fully vindicated here by the grant of declaratory and injunctive relief." Slip Opinion, page 19. If Polson's Fourth Amendment rights are to be fully "vindicated," an award of compensatory damages in a reasonable sum must be imposed. Considering all the circumstances, including the ultimate result of the incursion, an award of $2,500 seems adequate but not excessive. Attorneys' fees and costs of litigation will also serve as vindication.

■ Turning to the shooting itself, the Court's findings dictate entry of a judgment in favor of defendant Jackson. Even assuming that Jackson made at least two significant errors in carrying out his duties, (the entry and the possible misjudgment of the need for firing his pistol) the Court is unable to determine that Polson's constitutional rights were violated by the shooting, or that his state law protection against assaults was impermissibly frustrated.

■ With respect to Missouri law, it now seems established that a physical struggle with a police officer during the performance of his duties is not sanctioned by a claim that the officer has exceeded his lawful authority. *State v. Nunes,* 546 S.W.2d 759 (Mo.App.1977). If the right to use force to resist an unlawful arrest was ever recognized as a rule of Missouri common law, such rule has been superseded by a less rugged doctrine. *State v. Thomas,* 625 S.W.2d 115, 121 (Mo.1981). While it is pos-

sible that both combatants in this case acted out of fear, or misjudgment, the law strikes a balance in favor of police officers performing their duties in good faith and without extraordinary disregard of the rights of arrestees. There is no basis for concluding that Jackson acted vindictively or with such gross disregard of Polson's rights as to authorize tort liability.

*Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir. 1976), vacated as moot, *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), is not to the contrary. In that case, the Court of Appeals for the Eighth Circuit was presented with an instance of cold-blooded shooting of a fleeing felon. The conflicting policy considerations sharply divided the Court. *Mattis* was not a case where the officer felt endangered, or was seeking to control an immediate threat of lawlessness of unfathomable dimensions. While Polson may have been on the verge of surrendering, and conceivably had begun to pull away from Jackson (a debatable proposition) the Court concludes that no objective manifestation of his intention got through to Jackson before the trigger was pulled, and there was no conduct here which may be compared with the shooting of a distant quarry.\*

An opinion by Chief Judge Lay recently reviewed federal law on the use of excessive force during an arrest. *Putman v. Gerloff*, 639 F.2d 415 (8th Cir. 1981). While each case turns somewhat on its own facts, the Court is unable to find any authority for imposing liability for violation of constitutional rights when a shot is fired as a result of the type of harried misjudgment which could be attributed to policeman Jackson in this case. A police officer is "not required to nicely measure or narrowly gauge the force to the amount required from a deliberate retrospective view." *Conklin v. Barfield*, 334 F.Supp. 475, 479 (W.D.Mo.1971—Becker, C.J.). *See also Landrum v. Moats*, 576 F.2d 1320 (8th Cir. 1978) cert. denied 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258.

\* See *Jones v. Marshall*, 528 F.2d 132, 140 n.16 (2d Cir. 1975), noting a distinction between the relatively unprivileged use of deadly force to

Judgment will therefore be granted in favor of defendant Jackson on the shooting claim, but against defendant Jackson on the Fourth Amendment claim. Judgment will be entered in favor of the defendant city on all claims.

For the stated reasons, upon assessment of attorneys' fees as scheduled below, a judgment in favor of plaintiff against defendant Jackson will be entered, in the sum of $2,500.

ORDERED that plaintiff's counsel submit, within twenty days from the date of this order, an affidavit with supporting records and suggestions on the issue of attorney fees, including the alternative of full fees or a pro rata allowance. Defendants may respond within ten days after the filing of plaintiff's affidavit and suggestions.

prevent escape and the greater right to use force "to counter force" when "effectuating an arrest."