**STATE of Missouri, Respondent,**

v.

**Gerald CARNAHAN, Appellant.**

**No. WD 49582.**

Missouri Court of Appeals,
Western District.

Dec. 26, 1995.

Jon Van Arkel, District Public Defender, Springfield, for appellant.

Thomas E. Mountjoy, Pros. Atty., Cynthia A. Rushefsky, Asst. Pros. Atty., Greene County, Springfield, for respondent.

Before BERREY, P.J., and ULRICH and ELLIS, JJ.

BERREY, Judge.

Appellant was charged in Greene County with the class A misdemeanor of assault of a law enforcement officer in the third degree, § 565.083, RSMo. Supp.1993, and the class B misdemeanor of unlawful use of a weapon in violation of § 571.030.1(5), RSMo. Supp.1993. The appellant sought and received a change of venue pursuant to Rule 32.04, and the case was bench tried in Clay County, Missouri.

Appellant was then convicted of both counts and sentenced to 11 months in the Greene County jail on Count I and 4 months in the Greene County jail on Count II, with the sentences to run consecutively.

This appeal follows wherein appellant alleges two points of trial court error. He claims the trial court erred in overruling his motions for acquittal because of insufficient evidence. Specifically, appellant argues the evidence was insufficient to sustain the assault conviction in that the state failed to prove the required culpable mental state. Appellant next contends the evidence was insufficient to sustain the unlawful use of a weapon conviction in that the state failed to prove the required element of intoxication.

Affirmed.

To fully develop the flavor of this appeal, a detailed recitation of the facts as presented at trial is not only helpful but necessary. Five policemen testified as having been present during the episode culminating in the two misdemeanor charges filed against appellant. In fact, a total of eight or nine Springfield policemen were involved. Officer James Closser, a three-year veteran with the Springfield Police Department, testified he responded to a "panic alarm" at 1365 South Devon Street. Upon his arrival, Closser waited for back-up officers to arrive. From previous calls, Closser stated the person who lived there was anti-police and possessed weapons.[1] Following the arrival of back-up, Closser and other officers looked through windows in an attempt to determine whether anyone was "... causing danger to the occupants ..." This inspection failed to produce any illicit activity. Next, Closser viewed appellant standing in his home holding a shotgun with the barrel pointed toward the ceiling. Upon seeing this, Closser notified his sergeant, and other officers were dispatched to the scene. The initial police response was triggered by a "panic alarm" of unknown origin.

According to Closser, appellant was fully clothed at this time. Closser and the other officers then set up "a perimeter." Closser subsequently "thought" he heard a gun shot. Closser later observed the appellant exit the home wearing "only his underwear and a t-shirt." Appellant was carrying a camera. At this point, appellant was detained by Officer David Vallely. Officer Bookout then "entered the house to secure it." Closser also entered the house and found appellant's wife coming out of a bedroom. Closser gathered up appellant's guns and photographed them but did not remove them from the premises. Closser described finding a hole in the carpet and a .22 caliber shell casing on the floor. However, the officers did not locate a .22 caliber weapon in their search of the premises. Closser stated that appellant appeared intoxicated in that "[h]is eyes were glassy and kind of bloodshot." Closser did not smell the odor of liquor on him. Closser testified that appellant was taking pictures as he exited the house. Closser stated appellant was eight to ten feet from the front of the house and was being detained for investigation. Closser subsequently observed appellant handcuffed and lying on the ground. Closser acknowledged he observed no violation of law, and that he did not immediately upon arrival announce he was a police officer.

Officer David Vallely generally substantiated Closser's testimony. Vallely stated that upon his arrival (and before appellant was

1. Neither are crimes in and of themselves.

detained as mentioned above) he saw appellant's garage door open. Officer Vallely stated he "needed [his] flashlight to light up the interior of the garage." In fact, Vallely used a 30,000 candle power handheld light. Vallely stated he then observed appellant in the garage holding a long gun with its barrel pointed toward the ceiling. Vallely stated that appellant refused to come out, shut the garage door, and, after a few minutes, exited unarmed through the front door of the house. Vallely then detained appellant in front of the house and conversed with him, but he stated, "I didn't smell any thing." He could not say whether or not appellant was intoxicated. Vallely further testified that appellant told him nothing was wrong and to leave his property.

Corporal Dave Zuhlke testified next. He responded to a radio call because it contained information that a gun was involved. When Zuhlke arrived, appellant was in the front yard with two other officers. Zuhlke ordered appellant's camera taken from him and appellant placed in handcuffs. Zuhlke stated that appellant was not placed under arrest and that "[appellant] was taking pictures to sue." Zuhlke stated that he smelled intoxicants on appellant's breath and that appellant's eyes were watery and bloodshot and in his opinion appellant was intoxicated. Zuhlke found empty beer cans in the garage. He also noted the house was "... clean, well kept."[2] The following colloquy typifies the entire episode:

Q. And you ordered his detention or arrest there in the front yard before you went in the house, right?

A. Well, I ordered that he be detained, yes.

Q. Well, you call people being detained and being arrested the same thing, or is that different?

A. One can lead to the other.

Q. When you put a man down on the ground with handcuffs on him, is that detained or arrested. Which is it?

A. Well, he may have been arrested at that point, but I didn't do that. I asked

that he be handcuffed. I didn't say detain him or arrest him.

Q. Oh.

A. I asked that he be placed in handcuffs.

Q. But you put a man in handcuffs, and you don't call that arresting him?

A. Not always, no.

Q. When does he become arrested when you put the handcuffs on him?

A. At that time, he was detained for our safety.

Q. No, let's get back to my question. When you put handcuffs on a man, do you consider that arresting him?

A. Sometimes.

\* \* \*

Q. You didn't do that. Now you said he had a camera in his hand. Did you take the camera?

A. I didn't, no.

Q. Did your officers take the camera?

A. I don't know.

Q. You didn't order it taken?

A. I said take the camera out of his hands, place him in handcuffs. I saw the camera. I didn't spend any time with Mr. Carnahan after that.

Q. You didn't. What about the pictures that he had taken, where are they?

A. I don't have any idea.

Q. Did you seize them or order your men to seize them?

A. No.

Q. You did not? You don't know anything about that?

A. No.

Four-year Officer James McCulloch testified that he too responded to an "alarm call." McCulloch stated he put appellant to the ground with his hands cuffed behind him. Subsequently, appellant kicked McCulloch. McCulloch's verbatim testimony is instructive:

Q. You arrested him?

A. No.

Q. You handcuffed him?

2. The garage is a natural place for trash containers and empty cans.

A. Yes.

Q. You don't consider that an arrest?

A. At that time, no.

Q. Did you restrain his liberty, did you?

A. I detained him.

Q. Do you call that restraining his liberty?

A. I'm saying I detained him there at that time.

Q. I'm asking you do you consider that restraining his liberty?

A. He wasn't free to go if that's your question, yes.

Q. The answer is yes, that's restraining his liberty?

A. That's—that's not words I would put it in.

Q. Okay. Now, what did you do? Did you see anybody else take these pictures that he had taken with his Polaroid?

A. No.

Q. Do you know what happened to them?

A. No, I don't.

* * *

Q. He was in his shorts all this time?

A. That's correct.

Q. And you had him down on the ground? You pushed him down on the ground?

A. I laid him down on the ground, yes.

Q. And you told him to either get down or you pushed him down, didn't you?

A. Neither.

Q. How did he get down on the ground then?

A. I told you I laid him on the ground.

Q. You told him you'd lay him on the ground?

A. No, sir. I laid him on the ground is what I'm telling you.

Q. How did you do that?

A. I took him by the arm and laid him down on the ground.

Q. You took him by which arm?

A. His left arm.

Q. Now if you put him down on the ground, laid him down on the ground, you'd have to push him down, wouldn't you?

A. I pulled on him, yes.

Q. And you had his hands behind his back?

A. That's correct.

Q. Is that right?

A. That's correct.

Q. You call that laying him on the ground?

A. That is correct.

Q. Putting him down on the ground?

A. That's correct.

Q. And he was on [sic] handcuffs?

A. Yes.

Q. All he had on was jockey shorts?

A. That's right.

Q. No shoes, no socks, no pants, no shirt?

A. No.

Q. Is that right?

A. That's correct.

Q. This is in the middle of the night?

A. Yes.

Q. And you arrested him pursuant to this—what [sic] the guy's name, Sergeant Zuhlke, something like that?

A. No, I didn't arrest him. I detained him in front of the house.

Q. You didn't arrest him. You detained him in handcuffs?

A. That's correct.

Q. I understand. Now, you're saying that—let's get to this part where you—you said that—let's talk about your injury. Did you seek any medical care for your injury?

A. No, I didn't.

Q. Did you break any bones?

A. No.

* * *

Q. Twice. Let's see what your report says about that. That's all he kicked you, but the kicking was all over when you maced him. Right?

A. That's correct.

Q. Was it necessary to mace him?

A. Yes, it was.

Q. Why?

A. To keep him from kicking me again.

Q. But you had already pushed his leg away with your foot?

A. I was kicked again.

Q. But you pushed his leg away with your foot. He's kicking you and you're kicking him?

A. No.

Q. And then the kicking is all over when he got the mace, right?

A. I'd been kicked. I didn't know the kicking was over.

Q. But you maced him after the kicking incident occurred?

A. That's correct.

Q. So it never occurred any more, did it? You maced him?

A. That's correct.

Q. Did he become unconscious or blind, or what happened?

A. No. It temporarily blurs a person's vision, blinds them, yes. That's what it's for.

Q. How many officers were out there with you?

A. Myself and two others.

Q. Took three of you and you still couldn't control him. You had to mace him. Is that what you're telling us?

A. That's absolutely correct.

Q. Did he kick any of the other officers?

A. No.

Q. They maced him. He didn't get a chance, right?

A. That's correct.

Q. He didn't?

A. That's right.

Officer Eric Wahlquist also testified for the state. He is a five-year veteran. He explained why the weapons were not seized.

Q. Did—was Mr. Carnahan to your knowledge ever placed under arrest at the scene?

A. No, he was not.

Q. Why didn't you take the guns into custody?

A. I was instructed by Lieutenant Brazeel (ph) who was on the scene and Acting Sergeant Dave Zuhlke, who was on the scene, not to take the weapons.

The testimony does not explain what constitutes a "panic alarm" or what caused this "panic alarm" to be transmitted to the police. It is, however, clear from the evidence that the appellant was in his own home, and the officers upon arrival observed no illegal activity.

■ In reviewing this case for sufficiency of evidence, this court is to "... accept as true all evidence, direct or circumstantial, and all reasonable inferences supportive of the verdict and disregard those portions of the record contrary to a finding of guilt." *State v. Turner,* 623 S.W.2d 4, 6 (Mo. banc 1981).

For Point I, appellant argues the state was unable to establish his intent to commit assault. He contends that since no weapon and no serious injury was involved, intent to commit assault cannot be presumed. We disagree.

■ The uncontroverted evidence was that appellant twice kicked Officer McCulloch. Appellant's intent to commit assault may be inferred from his actions. *State v. Burton,* 863 S.W.2d 16, 17 (Mo.App.1993). And completion of the act is not a bar to the successful prosecution of an attempt. *State v. O'Dell,* 684 S.W.2d 453, 462 (Mo.App.1984), *cert. denied,* 488 U.S. 930, 109 S.Ct. 319, 102 L.Ed.2d 337 (1984).

■ At common law, one could resist an unlawful arrest using as much force as was necessary. *State v. Thomas,* 625 S.W.2d 115, 121 (Mo.1981). But that is no longer the law in Missouri. "[A]n arrestee no longer enjoy[s] a right to resist an unlawful arrest by a known police officer." *Id.* It is no defense that the officer lacked probable cause to arrest. *State v. Rodriguez,* 484 S.W.2d 203, 206–07 (Mo.1972).

The state maintains that there was no arrest of the appellant even though he was handcuffed and lying on the ground. According to Officer Closser, appellant was being detained for investigation and was not

under arrest. The evidence clearly establishes that the appellant did, in fact, kick Officer McCulloch. This is sufficient to establish his guilt under § 565.083. Society will not tolerate the assault of an officer regardless of the circumstances. Should one feel aggrieved by what he perceives as unlawful conduct by a police officer, the civil courts are open to him.

Appellant's Point I is denied.

In Point II, appellant alleges that there was insufficient evidence to sustain the conviction of unlawful use of a weapon, § 571.030.1(5), because the state did not prove the element of intoxication. However, an officer with experience dealing with intoxicated persons may render an opinion as to intoxication sufficient to sustain a conviction. *State v. Wilson*, 846 S.W.2d 796, 798 (Mo. App.1993). The first two officers on the scene could not testify that appellant was intoxicated. However, Officers Zuhlke and Wahlquist stated that based on their observation of appellant's watery bloodshot glassy eyes, swaying and staggering gait, slurred speech and odor of alcohol on his breath it was their opinion appellant was intoxicated.

Following the dictates of *State v. Smith*, 849 S.W.2d 209, 212 (Mo.App.1993), we affirm the trial court's decision unless it erroneously declares or applies the law or unless there is no substantial evidence to support it or it is against the weight of the evidence.

In the instant case the trial court heard the witnesses and observed their demeanor. The trial court is in the best position to judge witness credibility. Rule 73.01(c)(2); *Gage v. Townsend*, 846 S.W.2d 769, 769–70 (Mo.App. 1993). Contrary to appellant's contention, the state has established that appellant was in possession of a weapon while intoxicated.

Point II is denied.

Convictions affirmed.

All concur.