Joshua C. VOGEL, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 57549.

Missouri Court of Appeals,
Western District.

Sept. 19, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 31, 2000.

Application for Transfer Denied
Dec. 5, 2000.

Andrew A. Schroeder, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Susan K. Glass, Asst. Attys. Gen., Jefferson City, for Respondent.

Before: EDWIN H. SMITH, P.J., and ULRICH and ELLIS, JJ.

EDWIN H. SMITH, Presiding Judge.

Joshua C. Vogel appeals from the circuit court's order overruling, after an evidentiary hearing, his Rule 29.15[1] motion for post-conviction relief. After a jury trial in the Circuit Court of Buchanan County, the appellant was convicted of two counts of assault in the first degree, § 565.050,[2] two counts of armed criminal action, § 571.015, and one count of unlawful use of a weapon, § 571.030.1(3). As to his convictions for assault in the first degree on Counts I and II, the appellant was sentenced to fifteen years imprisonment on each count. As to his convictions for armed criminal action on Counts III and IV, he was sentenced to twenty years imprisonment on each count. As to his conviction for unlawful use of a weapon on Count V, he was sentenced to four years imprisonment. His sentences as to Counts I—IV were ordered to run consecutively, with his sentence as to Count V to run concurrently with Count I.

The appellant raises six points on appeal in which he claims that the motion court erred in overruling his Rule 29.15 motion for post-conviction relief because, contrary to the findings of fact and conclusions of law of the motion court, he received ineffective assistance of trial counsel.

We affirm.

## Facts

On the evening of February 7, 1996, the appellant attended a party at the apartment of Mike Bleazard in St. Joseph. During the party, the appellant had a conversation with a woman about buying a gun from him and was observed putting something in the waistband of his pants. At some point, he left the party. After leaving the party, he drove Bleazard's truck to "Brew's," a tavern in St. Joseph. He was accompanied by a friend, Glen Hayward.

When Hayward and the appellant entered Brew's, the appellant saw Randy Griggs, who was dating a girl with whom Hayward had previously been involved. Hayward walked behind Griggs, put his hands on Griggs's shoulders, and said, "I've got brass knuckles," and "[m]y friend, Josh Vogel's got a gun." At some point, Griggs then left the tavern with Hayward and the appellant following. Once outside, Hayward began yelling and swearing at Griggs's girlfriend who was sitting in Griggs's car. Griggs got into his car and drove away. He later returned with his two brothers and a friend because he thought his uncle, Marion Hastings,

1. All rule references are to the Missouri Rules of Criminal Procedure (1998), unless otherwise indicated.

2. All statutory references are to RSMo 1994, unless otherwise indicated.

who was still at Brew's, might be in danger.

When Griggs pulled into the parking lot, he saw several people gathered outside yelling, including the appellant, Hayward, Hastings, and Sam Losson. Griggs and his brothers exited the car and confronted Hayward, who told them, "My partner, Josh Vogel's got a gun," at which point the appellant pulled out a gun. Charlie Thomas, an acquaintance of Hastings, said that it was only a cap gun. Griggs's brothers ran back to their car with the appellant in pursuit. The appellant attempted to hit one of them in the back of the head with his fist. Griggs, while chasing the appellant, swung at him. The appellant hit him in the head with a gun, causing Griggs to fall to the ground. One of his brothers then hit the appellant with a jack handle. Both the appellant and Hayward retreated to Bleazard's truck, with Losson and Thomas in pursuit.

Having reached the truck, the appellant yelled, "I'll show you a cap gun or a fucking cap gun." The appellant then shot Losson in the stomach. As Thomas attempted to "walk" away from the area, the appellant shot him in the back. After the shootings, the appellant and Hayward got into the truck and drove off. The next day, the appellant, his aunt, and Bleazard all left in Bleazard's truck for Las Vegas, Nevada. On the way there, the appellant told Bleazard that he had fired a gun the night before at Brew's. When they arrived in Las Vegas, Bleazard cleaned out his truck and found "many spent casings and a few live rounds and .22 calibers." He testified that he was not responsible for the ammunition and spent casings being in his truck.

The appellant flew back to Missouri after spending a week in Las Vegas. Bleazard was under the impression that he went back to turn himself in to the police. However, approximately two weeks later, the appellant returned to Las Vegas. Upon his return, he told Bleazard that on the same evening as the shooting at the

bar, he and Hayward had driven by Griggs's house, and that Hayward had fired a gun into the house.

The appellant was arrested on June 6, 1996, in Las Vegas. He waived extradition and was returned to St. Joseph. He was charged on June 28, 1996, with two counts of assault in the first degree, § 565.050, two counts of armed criminal action, § 571.015, and one count of unlawful use of a weapon, § 571.030. The appellant went to a jury trial on December 3, 1996, in the Circuit Court of Buchanan County, Missouri, the Honorable Patrick K. Robb presiding. He was represented by an assistant public defender, Timothy Ernst. At trial, the State called several witnesses, including the victims, who identified the appellant as the shooter.

During the defense's case, the appellant testified that he did not have a gun when he left the party on the night of the shootings, and he was not in possession of a gun at any time prior to his trip to Las Vegas. According to the appellant, Griggs instigated the confrontation in the parking lot by rushing Hayward and him. The appellant testified that as he turned away from Griggs, he was struck with a tire iron and knocked to the ground, at which point he picked up a rock to defend himself. He further testified that he hit someone with the rock and then heard another person say, "He's got a gun." Unsure of who had a gun, he, along with Hayward, ran for Bleazard's truck. He said he could hear footsteps following them, but he did not turn to look. After entering the truck, the appellant claimed that Hayward, who was standing outside the truck on the driver's side, began shooting at the victims. He testified that he was unaware Hayward possessed a gun. Hayward then ran around the front of the truck, jumped in the passenger side, and yelled, "Get out of here!" The appellant had driven two blocks down an alley when Hayward ordered him to stop the truck, pointed the gun at him, and said, "Get out," which he did. Hayward then drove off. The appel-

lant walked to a friend's house where he spent the night.

On December 5, 1996, the jury found the appellant guilty as charged. On January 22, 1997, he was sentenced on all five counts. He appealed, and his convictions and sentences were affirmed by this court in *State v. Vogel,* 959 S.W.2d 147 (Mo.App. 1998). On March 19, 1998, he timely filed a *pro se* Rule 29.15 motion to vacate, set aside, or correct the judgment and sentences, claiming ineffective assistance of trial counsel. Counsel was appointed and filed an amended motion on July 6, 1998, requesting an evidentiary hearing. An evidentiary hearing on the appellant's motion was held on October 1, 1998. After hearing evidence, the motion court took the appellant's motion under advisement. On June 7, 1999, the court entered its findings of fact and conclusions of law, and entered its order denying the appellant's motion.

On August 7, 1999, the appellant requested leave to file his notice of appeal out of time. On August 12, 1999, the trial court granted his request, and his notice of appeal was filed.

## Standard of Review

■ Appellate review of a motion court's ruling on a Rule 29.15 motion for post-conviction relief is limited to a determination of whether the court's findings of fact and conclusions of law issued in support thereof, as required by Rule 29.15(j), are clearly erroneous. Rule 29.15(k); *State v. Clay,* 975 S.W.2d 121, 140 (Mo. banc 1998), *cert. denied,* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999). Findings and conclusions are clearly erroneous only if, after review of the entire record, we are left with a definite and firm impression that a mistake has been made. *Clay,* 975 S.W.2d at 140.

## Discussion

The appellant raises six points on appeal in which he claims that the motion court erred in overruling his Rule 29.15 motion for post-conviction relief, after an evidentiary hearing, because, contrary to the findings of fact and conclusions of law of the motion court, he received ineffective assistance of trial counsel. We disagree.

■ In order to prevail on a claim of ineffective assistance of counsel, a movant must satisfy the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984), requiring proof by a preponderance of the evidence that: (1) his trial counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney; and (2) his defense was prejudiced as a result. *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998), *cert. denied,* 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999); *State v. Simmons,* 955 S.W.2d 729, 746 (Mo. banc 1997). If the movant fails to satisfy either the performance or the prejudice prong of the test, then we need not consider the other and the movant's claim of ineffective assistance of counsel must fail. *State v. Nunley,* 980 S.W.2d 290, 292 (Mo. banc 1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1580, 143 L.Ed.2d 674 (1999).

■ To satisfy the performance prong, the movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *Simmons,* 955 S.W.2d at 746. A post-conviction movant faces a heavy burden in establishing a claim for ineffective assistance of counsel and must overcome the presumption that counsel is competent. *Nunley,* 980 S.W.2d at 292; *State v. Samuels,* 965 S.W.2d 913, 916 (Mo.App.1998). In determining whether counsel's performance was deficient, the courts must refrain from using hindsight to second-guess decisions of trial strategy. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694 (stating that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight. . . ."). Reasonable trial strategy is not subject to a claim for ineffective assistance of counsel. *State v. Harris,* 870 S.W.2d 798, 814 (Mo. *banc* 1994).

To satisfy the prejudice prong of the *Strickland* test, a movant "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Simmons,* 955 S.W.2d at 746. " 'The fact that an error by counsel might have had some conceivable effect on the outcome is not sufficient. Rather, movant, when challenging a conviction, must show there is a reasonable probability that, absent the alleged error, the fact finder would have had a reasonable doubt respecting guilt.' " *State v. Clark,* 925 S.W.2d 872, 878 (Mo. App.1996) (*quoting Bevly v. State,* 778 S.W.2d 297, 298–99 (Mo.App.1989)). "The court must consider the totality of the evidence in determining whether a reasonable probability exists." *Id.* In doing so, it can "consider the strength of the evidence of guilt in evaluating any prejudice to a defendant as a result of counsel's alleged ineffectiveness." *State v. Hopkins,* 918 S.W.2d 350, 353 (Mo.App.1996) (citation omitted).

In Points I and II, the appellant claims he received ineffective assistance of counsel in that his trial counsel failed to request the giving of certain jury instructions at trial. Specifically, in Point I, he claims that his trial counsel should have requested the giving of MAI–CR 3d 319.10, submitting the lesser-included offense of assault in the second degree, § 565.060.1, based on sudden passion. In Point II, he claims that his trial counsel should have requested the giving of MAI–CR 3d 306.06 and 306.08, submitting the issues of self-defense and the defense of others. In Points III and IV, the appellant claims that his trial counsel was ineffective for failing to "honor" his requests to present evidence at trial concerning the issues of whether the "shooter" was acting in self-defense or under the influence of sudden passion. As such, in all four

points, albeit in different contexts, the appellant is claiming that his trial counsel was ineffective in failing to submit to the jury: (1) whether he was not guilty of the crimes charged because the "shooter" was acting in self-defense or the defense of others; or (2) if it found that the "shooter" was not acting in self-defense or the defense of others, whether he was guilty of the lesser-included offense of second degree assault, rather than first degree assault, in that he was acting under the influence of sudden passion.

The resolution of the appellant's claims as to whether his trial counsel should have requested jury instructions on self-defense or the defense of others, or the lesser-included offense of assault in the second degree, based on sudden passion, is directly tied to the evidence that was or should have been presented by trial counsel to support the giving of the instructions. This is so in that we will not convict trial counsel of being ineffective in failing to request a jury instruction, unless the instruction should and would have been given under the evidence, if requested. *Johns v. State,* 741 S.W.2d 771, 775 (Mo. App.1987). As to both instructions argued for by the appellant, he had the burden to inject the issues in the case with substantial evidence. § 563.031.4; *State v. Bowman,* 869 S.W.2d 901, 903 (Mo.App.1994) (as to self-defense); *State v. Redmond,* 937 S.W.2d 205, 208 (Mo. *banc* 1996) (as to sudden passion). As such, the disposition of the instructional claims raised in appellant's Points I and II would be initially dependent on our disposition of the claims raised in Points III and IV, as to what trial strategies should have been pursued by appellant's trial counsel, and necessarily, what evidence should have been presented at trial in support thereof. Given this, we will address Points III and IV first, and because the resolution of the claims raised in both points are intertwined, we will address them together.

## I.

In both his points relied on in Points III and IV, the appellant claims that his trial counsel was ineffective for refusing to "honor" his requests to pursue certain trial strategies; specifically, in Point III, that the "shooter" acted in self-defense, and in Point IV, that he was acting under the influence of sudden passion. However, in neither of his points relied on does the appellant claim that his trial counsel was ineffective for failing to pursue the trial strategies in question. Yet, in the argument portion of both points, he contends that his trial counsel not only was ineffective for refusing to honor his requests with regard to pursuing the trial strategies in question, citing *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993) and *State v. Thomas*, 625 S.W.2d 115 (Mo.1981), but was also ineffective in that, whether requested or not, he should have presented evidence to establish that the shooter acted in self-defense and under the influence of sudden passion, and that if he had, there was a reasonable probability that the outcome of his trial would have been different.

Pursuant to Rule 30.06(c) Mo. R.CRIM. P. (1999) and Rule 84.04(d) Mo. R. CIV. P. (1999), we are not required to address any issue not raised in a point relied on, even if raised in the argument. *State v. Dodd*, 944 S.W.2d 584, 587 (Mo.App.1997). As such, we are not required to address whether appellant's trial counsel was deficient for failing to pursue the trial strategies that the shooter acted in self-defense or under the influence of sudden passion, but only if he was ineffective for refusing to honor the appellant's requests to present such strategies. However, as a practical matter, we necessarily will address the first issue in our discussion of the appellant's claims raised in Points I and II, concerning counsel's failure to request jury instructions on the issues of self-defense or the defense of others, and the lesser-included offense of second degree assault. This is so inasmuch as any requests by appellant's trial counsel for the giving of such instructions would have been futile unless the requisite evidence had been introduced first to support the giving of such instructions. *Johns*, 741 S.W.2d at 775; see also *Redeemer v. State*, 979 S.W.2d 565, 572 (Mo.App.1998) (holding that trial counsel will not be convicted of ineffective assistance of counsel for failure to engage in futile acts). As such, to fully address the issues raised in the appellant's Points I and II, we will read them as claiming that appellant's trial counsel was deficient for not presenting evidence and arguing at trial, as a matter of reasonable trial strategy, that the shooter was acting in self-defense or defense of others and under the influence of sudden passion, and for not requesting the appropriate instructions on the same.

In claiming as he does in Points III and IV, the appellant contends that, as a criminal defendant, he had a fundamental and absolute right to have the strategies he requested pursued at trial, even though it was contrary to the advice of trial counsel; and that counsel's failure to do so constituted ineffective assistance of counsel, regardless of the fact that it may not have changed the outcome of his trial. In other words, as to his claim that his trial counsel was ineffective for refusing to honor his requests as to what trial strategies to pursue, he is not only contending that a criminal defendant has an absolute right to make decisions regarding what defenses and mitigating circumstances are to be presented at trial, but that we should equate it with a basic and fundamental right, such as the right of a criminal defendant to testify at trial, such that the refusal of trial counsel to allow a defendant to make those decisions would constitute, *per se*, ineffective assistance of counsel. § 546.260.1; *Alff v. State*, 970 S.W.2d 401, 402 (Mo.App.1998); *State v. Fanning*, 939 S.W.2d 941, 949 (Mo.App.1997). Thus, to be successful on his claims for ineffective assistance of counsel, as asserted in Points III and IV, the appellant would not only have had to have alleged and proven that he had such a right, but that he exercised

this right and made his trial counsel aware of the trial strategies he was demanding that he pursue, who then refused to abide by them.[3]

With respect to his claims in Points III and IV, the appellant testified at the motion hearing that prior to trial he advised his trial counsel that, in addition to defending on the basis of misidentification that he was not the shooter, he wanted counsel to present evidence and argue that regardless of whether the jury found that he or Hayward was the shooter, the shooter was acting in self-defense or under the influence of sudden passion. He testified that his purpose in doing so was that if the jury found that the shooter acted in self-defense, then either as a principal, where he was found to be the shooter, or as an accomplice, where Hayward was found to be the shooter, he would have been acquitted. On the other hand, if the jury did not find that the shooter acted in self-defense, but acted under the influence of sudden passion, then, at worst, he would have been convicted as a principal or accomplice

of the lesser-included offense of assault in the second degree, rather than assault in the first degree. The appellant further testified that his trial counsel refused to abide by his requests because he advised him that in order to effectively argue that the shooter was acting in self-defense or under sudden passion, he would, as a practical matter, have to put the gun in the appellant's hand, which the appellant refused to allow. The appellant also testified that he felt he had no choice but to accept his trial counsel's choice of defenses. In this regard, appellant's trial counsel testified at the motion hearing, under direct examination by appellant's motion counsel:

> Q. Did you and Mr. Vogel have a disagreement over what defenses to present?
>
> A. No, I don't recall having any disagreement with Mr. Vogel.
>
> Q. Do you recall having a conversation with me sometime in June of '98?
>
> A. I remember talking to you, yes. I remember having a discussion with you

**3.** Unlike here, where the issue is whether trial counsel, despite his or her misgivings as to their advisability, is obligated and may not *refuse* to follow the directives of a criminal defendant concerning matters of trial strategy, in *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993) and *State v. Thomas*, 625 S.W.2d 115 (Mo.1981), relied on by the appellant, the Missouri Supreme Court was called upon to decide, in effect, the reverse situation—whether trial counsel was ineffective for *acceding* to his client's wishes and not pursuing an indicated defense strategy. Nonetheless, in *Debler*, citing *Thomas*, the court stated, "The defendant has the right to make such basic decisions as whether to plead guilty or go to trial, *what defenses to present at trial*, and whether to testify." 856 S.W.2d at 655 (emphasis added). This would seem to be contrary to Rule 4–1.2 Mo. RULES OF PROF'L CONDUCT (2000) and *Wainwright v. Sykes*, 433 U.S. 72, 93, 97 S.Ct. 2497, 2510, 53 L.Ed.2d 594, 612 (1977) (Burger, C.J., concurring), neither of which include "what defenses to present at trial" as a basic decision exclusive to the defendant. In this respect, Rule 4–1.2(a) provides:

> A lawyer shall abide by a client's decisions concerning the objectives of represen-

tation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, *as to a plea to be entered, whether to waive jury trial and whether the client will testify.*

(Emphasis added.) In *Wainwright*, 433 U.S. at 93, 97 S.Ct. at 2510, 53 L.Ed.2d at 612, the United States Supreme Court held:

> Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any, to call, and *what defenses to develop.* Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client.

(Emphasis added.) In any event, the court in *Debler* and *Thomas*, for purposes of post-conviction relief, did not equate the right to decide what defenses to pursue with the basic rights of a criminal defendant to decide whether to testify, plead guilty, or accept a plea agreement.

over the telephone back in June. I don't recall saying we ver [*sic*] had a disagreement. We had a lot of discussions.

Q. And what were those discussions centered around?

A. Basically, about what defense we would be using in trial and what defenses were available and what defenses weren't available, is what I recall.

Q. What defense or defenses did Josh Vogel want to present at trial?

A. As I recall, we discussed—first and foremost, we discussed from the very beginning the fact that Joshua claimed to not have had a gun or to have fired any shots. And that it was the uncharged co-defendant that did all the shooting. And that Joshua was even unaware that the other person had a gun. And that he was surprised when there was shots fired. And was later threatened by this individual and forced out of the vehicle they were in after they fled the scene.

So, basically, that the other guy did it was the one defense we talked about.

Q. And that was the defense presented at trial?

A. Yes, that was the defense presented at trial. I believe we might have talked about the fact, in a shooting case, self-defense might be an option. I don't remember what else we might have talked about. Those two for sure.

Q. So it's your testimony that you did talk about the self-defense theory?

A. I think we probably talked about it once or twice. I don't remember having a disagreement with it because I don't recall ever thinking that it was really a viable option.

Q. Are you aware that your boss, Anthony Cardarella, met with Joshua before the trial commenced?

A. Yes.

Q. And are you aware of what that meeting concerned?

A. I believe it was a concern of Joshua Vogel that he didn't want me to represent him. And I don't recall discussing that with Anthony Cardarella, other than the fact that Anthony wasn't going to take me off the case.

Q. So it is your testimony today, you have no idea why Mr. Vogel was disgruntled with you?

A. I don't recall today any actual complaints that he made to me. I remember he was disgruntled about several things through the course of the trial. Not being seen everyday at the jail, not wanting to—he was upset. One of the things he was upset about was that we couldn't locate this other uncharged co-defendant even though we tried to find him. And the police couldn't find him either. I don't recall anything else specifically that he was disgruntled about. I mean, he was one of those clients that was disgruntled from the time I started representing him until the case was over with.

Q. So it is your testimony today that Mr. Vogel was not disgruntled over the defense issue?

A. No. My testimony is, I don't recall that being specifically one of the issues he was disgruntled about.

Q. But you're not saying he wasn't disgruntled about that?

A. I don't remember for sure.

Q. Did you consider the defense of misidentification and the defense of self-defense to be consistent with each other?

A. In this circumstance, yes.

Q. Is that why you refused to present the defense of self-defense at trial?

A. I don't recall there ever being any— I think I probably refused to do anything about self-defense because I didn't think it was a viable defense.

The defense we were presenting was, at best, going to be incredulous to a jury by trying to throw misidentification in there and also claim that it was a self-defense case. We were trying to paint

the uncharged co-defendant as a drunk, aggressive bully who decided to start shooting a gun. And Joshua having the—our view was, Joshua never had a gun, never fired any shots, and was running away when this other guy did all this shooting.

The facts of the case involved at least one of the victims being shot in the back. Trying not only to put the blame on the other uncharged co-defendant and claim self-defense with an individual shot in the back, there's a time when you get to the point where you're straining the jury's credibility too much. And I don't believe these were viable in this case.

Q. I'm a little confused. Are you saying it wasn't a viable defense or that you think it would have been too confusing for jury?

A. I never said confusing. I think by trying to use the theory that we were using already, the misidentification of the shooter and the theory that this other guy was a hostile, aggressive individual who took it upon himself to begin shooting, and then later threatened our client, that was an incredible story to begin with.

By trying to claim he was acting in self-defense—since Joshua claimed he never had a gun and never did any shooting, so he wasn't acting in self-defense—I think would have been more incredible to the [jury]. I don't think it would have confused them. I think it would have upset them if they thought we might be trying to pull something over on them. That's why I thought they were incompatible. Not because they were confusing to the jury.

Q. Is it your testimony today, the facts that were presented at trial did not support a self-defense theory?

A. I did not believe so, no. I still don't.

. . .

Q: Ultimately, if there is a conflict over what defense is presented at trial, whose choice is it to make?

A: I believe it's the attorneys [*sic*].

Q: And is that what happened in this case?

A: I believe in this case, I think I discussed it with Mr. Vogel and convinced him—at least I believe I convinced him—that the tactical move we were making was the sounder move.

◼ If appellant's trial counsel's testimony was believed, which the motion court was free to do, *Rodden v. State*, 795 S.W.2d 393, 397 (Mo. *banc* 1990), it was reasonable for it to find and conclude that the appellant never requested or demanded of his trial counsel, or that he refused to pursue, a trial strategy involving the submission of the lesser-included offense of assault in the second degree based on sudden passion. This fact is also borne out by the testimony of Suzanne Meyer, who second-chaired appellant's trial counsel, Ernst, and who testified at the motion hearing that the disagreement between the appellant and Ernst was over whether to pursue a defense of self-defense, as well as the defense of misidentification. She did not testify to any disagreement over whether to pursue the lesser-included offense. As such, the motion court's findings and conclusions denying the appellant's claim in Point IV, that his counsel was ineffective for failing or refusing to honor his request to pursue at trial the lesser-included offense of assault in the second degree under the influence of sudden passion, were not clearly erroneous.

As to Point III, trial counsel's alleged failure or refusal to honor the appellant's request to pursue the defense of self-defense, the motion court was justified in finding and concluding that the appellant, after fully discussing and consulting with trial counsel, agreed with him that, as a matter of trial strategy, it would be best to proceed solely on the defense of misidentification that he was not the shooter. Having acquiesced in counsel's action, he cannot now ask us to convict him of being ineffective on that basis. *Thomas,* 625

S.W.2d at 124. "The failure of a strategy knowingly and voluntarily pursued by defendant does not entitle him to another try under the guise of ineffective assistance of counsel." *Id.*

Points III and IV are denied.

## II.

In Points I and II, the appellant claims he received ineffective assistance of counsel in that his trial counsel failed to request the giving of certain jury instructions at trial. Specifically, in Point I, he claims that his trial counsel should have requested the giving of MAI–CR 3d 319.10, submitting the lesser-included offense of assault in the second degree, § 565.060.1, based on sudden passion. In Point II, he claims that his trial counsel should have requested the giving of MAI–CR 3d 306.06 and 306.08, submitting the issues of self-defense and the defense of others. As we discussed, *supra,* inasmuch as appellant's trial counsel could not be convicted of ineffective assistance of counsel for failing to request the instructions in question unless there was evidence already in the record supporting their giving, we necessarily interpret his Points I and II, in conjunction with his alternative arguments in Points III and IV, as claiming that his trial counsel was deficient for failing to present evidence and requesting instructions on the issues of whether the shooter was acting in self-defense or the defense of others, and whether the shooter was acting under the influence of sudden passion.

■ In making his claims, the appellant contends that self-defense or the defense of others, or a conviction on the lesser-included offense of second degree assault, should have been pursued by his trial counsel whether the jury found that Hayward or he was the shooter. In this regard, to properly raise the issue of self-defense or the defense of others, as provided in § 563.031, the burden would have been on the appellant's trial counsel initially to inject the issue into the case with substantial evidence, after which the State would have had the burden to prove beyond a reasonable doubt that the assaults on the victims were not justified. *Bowman,* 869 S.W.2d at 903. "A trial court is obligated to instruct on self-defense if the evidence, when viewed in a light most favorable to the defendant, supports giving the instruction." *State v. Houcks,* 954 S.W.2d 636, 638 (Mo.App.1997) (*citing State v. Weems,* 840 S.W.2d 222, 226 (Mo. banc 1992)). To carry his burden of injecting the issue of self-defense or the defense of others in his case, the appellant was required to come forward with substantial evidence showing: (1) an absence of provocation or aggression on the part of the shooter; (2) a reasonable belief that deadly force was necessary to protect himself or a third person against an immediate danger of death or serious physical injury; (3) a reasonable cause for that belief; and (4) an attempt by the shooter to do all within his power consistent with his own personal safety to avoid the danger and the need to use deadly force on the victims. § 563.031; *State v. Chambers,* 671 S.W.2d 781, 783 (Mo. banc 1984).

■ As to the appellant's claim with respect to pursuing and instructing on the lesser-included offense of assault in the second degree, as provided in § 565.060, a "trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court." *Redmond,* 937 S.W.2d at 208. Section 565.060 reads, in pertinent part:

1. A person commits the crime of assault in the second degree if he:

(1) Attempts to kill or knowingly causes or attempts to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause;

. . . .

2. The defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause under subdivision (1) of subsection 1 of this section.

"Adequate cause" is defined in § 565.002(1) to mean "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." "Sudden passion" is defined in § 565.002(7) as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation."

█ In *State v. Simmons,* 751 S.W.2d 85, 91 (Mo.App.1988), *overruled on other grounds by Redmond,* 937 S.W.2d at 209–10, the court clarified the concepts of sudden passion and adequate cause, stating:

> To be "adequate," the provocation must be of a nature calculated to inflame the passions of the ordinary, reasonable, temperate person. In order for an offense to be reduced to one less culpable, there must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Passion may be rage or anger, or terror, but it must be so extreme that for the moment, the action is being directed by passion, not reason.

"The defendant has the burden of injecting the issue of influence of sudden passion arising from adequate cause. This means the issue is not submitted to the trier of fact unless supported by the evidence." *Redmond,* 937 S.W.2d at 208 (citation omitted).

█ As to the appellant's being the shooter and arguing that he acted in self-defense or defense of Hayward, or under the influence of sudden passion, his trial counsel testified at the motion hearing that this course of action would have been, as a practical matter, inconsistent with the appellant's main defense that the State's witnesses were mistaken when they identified him as the shooter. As counsel testified, to argue on the one hand that the appellant was not the shooter, but if the jury found that he was, he was acting in self-defense or under sudden passion, "would have upset [the jury] if they thought we might be trying to pull something over on them." We would agree with counsel that, although it might have been technically possible to argue that the appellant was not the shooter, but if the jury found that he was, it should consider whether he was acting in self-defense or the defense of others or under sudden passion, such an argument is clearly susceptible to significant credibility questions by the jury. In this respect, it is easy to imagine what the jury would have thought if, after the appellant testified that he did not have a gun and did not shoot the victims, trial counsel would have presented evidence and argued that if the appellant did shoot the gun, he only did so in self-defense or defense of Hayward, or under the influence of sudden passion.

It is difficult for us to perceive how the issue of self-defense or the defense of Hayward or sudden passion could have been adequately injected into the appellant's case, justifying the giving of the applicable jury instructions thereon. It is equally difficult for us to imagine how the jury would have ever concluded that the appellant acted justifiably in shooting the victims, or that he acted out of sudden passion, without testimony from either the appellant or Hayward as to the circumstances under which the appellant was caused to shoot the victims. Inasmuch as Hayward's whereabouts were unknown at the time of trial, appellant's testimony would have necessitated the appellant's abandoning his misidentification defense, which he adamantly refused to do.

In addition to the practical problems of presenting the case as argued for by the appellant in his motion, where the jury believed him to be the shooter, trial counsel, in making his trial strategy determina-

tions, was also confronted with the fact that much of the undisputed physical evidence and the testimony of the appellant would not have favored a finding by the

jury that the appellant acted in self-defense or the defense of Hayward, or under the influence of sudden passion.[4] As such, given the likelihood that any argument for

4. In this respect, appellant's trial counsel testified at the motion hearing, in pertinent part:

> Q. Did you consider the defense of misidentification and the defense of self-defense to be consistent with each other?
> A. In this circumstance, yes.
> Q. Is that why you refused to present the defense of self-defense at trial?
> A. I don't recall there ever being any—I think I probably refused to do anything about self-defense because I didn't think it was a viable defense.
>
> The defense we were presenting was, at best, going to be incredulous to a jury by trying to throw misidentification in there and also claim that it was a self-defense case. We were trying to paint the uncharged co-defendant as a drunk, aggressive bully who decided to start shooting a gun. And Joshua having the—our view was, Joshua never had a gun, never fired any shots, and was running away when this other guy did all this shooting.
>
> The facts of the case involved at least one of the victims being shot in the back. Trying not only to put the blame on the other uncharged co-defendant and claim self-defense with an individual shot in the back, there's a time when you get to the point where you're straining the jury's credibility too much. And I don't believe these were viable in this case.
> Q. I'm a little confused. Are you saying it wasn't a viable defense or that you think it would have been too confusing for jury?
> A. I never said confusing. I think by trying to use the theory that we were using already, the misidentification of the shooter and the theory that this other guy was a hostile, aggressive individual who took it upon himself to begin shooting, and then later threatened our client, that was an incredible story to begin with.
>
> By trying to claim he was acting in self-defense—since Joshua claimed he never had a gun and never did any shooting, so he wasn't acting in self-defense—I think would have been more incredible to the [jury]. I don't think it would have confused them. I think it would have upset them if they thought we might be trying to pull something over on them. That's why I thought they were incompatible. Not because they were confusing to the jury.
> Q. Is it your testimony today, the facts that were presented at trial did not support a self-defense theory?
> A. I did not believe so, no. I still don't.

> Q. Do you recall evidence at trial that Mr. Thomas was mad, drunk, and looking for a fight that morning because someone had stolen his black leather biker's jacket?
> A. I recall testimony he was upset about his biker's jacket being missing.
> Q. Do you recall—
> A. Believed to be taken.
> Q. Do you recall testimony that a fight ensued outside the bar in which Movant Mr. Hayward left Defendants Thomas, Lawson, Randy Griggs, Randall Griggs, Roy Griggs, and 15 to 20 unidentified persons?
> A. Yes, I do.
> Q. And do you recall evidence that many of the people involved in the brawl had weapons of opportunity, including jumper cables, jacks, tire tools, and car handles?
> A. Yes, I do.
> Q. Do you recall one of the Griggs brothers being hit on the head with a tire iron?
> A. I recall that being the testimony.
> Q. Do you recall a bloody tire tool being recovered from the scene?
> A. No.
> Q. Would reviewing the transcripts refresh your memory on that?
> A. Sure would. I haven't seen the file in probably two years.
> MR. SCHROEDER: May I approach the witness, your Honor.
> THE COURT: You may.
> A. What page?
> Q. I'm directing the witness to look at page 20 and 21, and page 36—or page 336.
> A. Page three—
> Q. Page 336.
> A. Yeah, that does refresh my memory.
> Q. And what is your testimony now?
> A. There was testimony about a tire iron. There was some type of red substance that the State's witness testified was blood, and I cross-examined that it hadn't actually been tested in any way. It was opinion evidence.
> Q. Do you recall that the blow to the movant's head was sufficiently forceful that it knocked the movant to the ground?
> A. I believe that was the testimony.
> Q. Do you recall the testimony that Mr. Lawson was swinging the set of jumper cables around and asking an angry mass whether he should hit the movant or Mr. Hayward first?
> A. I don't recall that specifically.
> Q. At what time did you know the answer to the question I'm asking?
> A. Well, I don't understand that question.

self-defense or defense of others or second degree assault, where the appellant was the shooter, would have failed and led to the rejection of his misidentification defense, appellant's trial counsel's trial strategy decisions were justified. Thus, under the circumstances, trial counsel's decision not to ask the jury to consider the issues of self-defense or the defense of Hayward or the lesser-included offense of assault in the second degree based on sudden passion, if it found the appellant was the shooter, was reasonable trial strategy which was not subject to attack as being ineffective assistance of counsel. *State v. Kenley,* 952 S.W.2d 250, 266 (Mo. *banc* 1997); *State v. Dixon,* 969 S.W.2d 252, 258 (Mo.App.1998).

▮▮▮▮ As a further reason for finding that the appellant's arguments in Points I

Q. At what time during the trial did you know the answer to the question I'm asking you now?

A. I would have to review the transcript to be sure. I don't remember.

MR. SCHROEDER: May I approach the witness, your Honor?

THE COURT: Yes, you many.

MR. SCHROEDER: I'm directing the witness to look at page 571 of the transcript, your Honor.

A. It does refresh my memory. There was testimony about that.

Q. Do you recall testimony that after Mr. Hayward helped the movant back to his feet, Mr. Hayward and the movant immediately retreated from Brew's Bar to the black pickup they were driving?

A. My recollection is they ran from the bar to the pickup.

Q. And when I say "movant," you realize I'm talking about Mr. Vogel?

A. Mr. Vogel, yes.

Q. And do you recall testimony that Mr. Thomas and Mr. Lawson chased Mr. Vogel and Mr. Hayward to Brew's—from Brew's Bar to the truck?

A. I believe so.

Q. Do you recall testimony that Mr. Vogel could hear people chasing them as they retreated to the truck?

A. I believe he was very specific that he recalled some people chasing him. I don't recall if it was because he saw them or heard them. I remember that was part of our defense. That's why he was in such a hurry to get to the truck.

Q. And is it still your testimony that the facts didn't support the self-defense theory?

A. Yes, because the shooting took place after all that. The shooting took place after the movant and Mr.—I can't remember the other guy's name—were back at the truck. And according the defendant, he was getting into the truck when the shooting occurred.

Also, I believe there was some factor about how far away from where this truck was and where the victims were when they were shot. And in my mind, that lessened the self-defense. I mean, because they were so far away from the truck that they could have gotten in the truck and driven off. Because none of those other people were in vehicles.

Also, one of the victims was then shot in the back. That indicates that he's not moving toward them anymore.

Q. Is it your testimony today that this evidence did not support even a reasonable inference that the shooter was acting in self-defense?

A. I don't believe so, no.

Q. Was it your strategy at trial to persuade the jury that Glen Hayward, not Joshua Vogel, was the gunman?

A. Was Glen Hayward the other individual with Joshua?

Q. Yes.

A. Yes.

Q. Did you anticipate that the defense would offer instructions on accomplice liability?

A. The defense or the prosecution?

Q. The prosecution. I'm sorry.

A. Yes, I did.

Q. What affect did that instruction on accomplice liability have on the misidentification defense?

A. As I recall, my theory was that the misidentification of the shooters wouldn't be affected much by the accomplice liability because they still have to show Joshua Vogel knowingly aided or abetted the accomplice in doing the act or encouraging the act. And I don't believe the testimony was going to show that.

Joshua Vogel's testimony was that he was completely surprised when Glen Hayward pulled out this gun and started shooting at people, and in no way had he encouraged or helped Mr. Hayward in obtaining or in shooting the weapon or injuring these people.

So the misidentification was simply due to the stress of the moment, not due to any action. I didn't see how the accomplice liability instruction would affect the misidentification.

and II have no merit where the appellant is found to be the shooter, is the fact that, as we discussed in Points III and IV, *supra,* the motion court was justified in finding that the appellant had acquiesced in the trial strategy of trial counsel and, therefore, could not now claim ineffective assistance of counsel on that basis. *Thomas,* 625 S.W.2d at 124. And, as a final reason for denying his claims, we would note from the record that there was overwhelming evidence of appellant's guilt, such that we are not convinced that the motion court was clearly erroneous in finding that even if trial counsel had pursued the trial strategies championed by the appellant, the outcome of the trial would have been any different, requiring us to reverse. *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. *banc* 1997).

 As noted, *supra,* the appellant further contends that the trial strategies in question should not only have been pursued as if he were found to be the shooter, but also as if Hayward were found to be the shooter. The record reflects that he was not charged as an accomplice to the shooter, but only as a principal. However, he contends that his counsel, anticipating that the defense's misidentification evidence would force the State to submit the case in the alternative on accomplice liability, which it did, should have pursued the defense strategies he requested with Hayward as the shooter. Appellant's trial counsel admitted that he did, indeed, anticipate the alternative submissions. However, counsel determined it was not compatible with appellant's main defense of misidentification to submit that Hayward, as the shooter, was acting in self-defense or the defense of the appellant or under the influence of sudden passion. This is so in that in order to convince the jury that the State's witnesses were mistaken when they identified the appellant as the shooter, it was necessary for appellant's trial counsel to paint Hayward as "a drunk, aggressive bully who decided to start shooting a gun" and as "a hostile, ag-

gressive individual who took it upon himself to begin shooting, and then later threatened our client." Appellant's trial counsel testified that this would have been, as a practical matter, in direct conflict with arguing the alternative trial strategies justifying or mitigating his acts. Consequently, it was trial counsel's best judgment that, in order to have any chance to succeed on the main defense of misidentification, which the appellant was adamant in presenting, it would not have been reasonable to pursue the alternative strategies where Hayward was found to be the shooter. Hence, we believe that the motion court was correct in finding that counsel's action in not pursuing the alternative strategies requested by the appellant was reasonable trial strategy not subject to attack for ineffective assistance of trial counsel. *Kenley,* 952 S.W.2d at 266; *Dixon,* 969 S.W.2d at 258.

 As further reason for finding that the motion court was correct in finding and concluding that it was reasonable trial strategy for appellant's trial counsel to refuse to pursue the alternative strategies, where Hayward was found to be the shooter, is the fact that, as we discussed, *supra,* the evidence was overwhelming that the appellant was the shooter, who was not acting in self-defense or the defense of Hayward or under the influence of sudden passion, such that the motion court was correct in finding that trial counsel's challenged acts were not outcome determinative. Thus, as the motion court found, the appellant did not satisfy the prejudice prong of the *Strickland* test, that absent trial counsel's alleged trial errors the outcome of his trial would have been different, entitling him to post-conviction relief for ineffective assistance of counsel. *Roberts,* 948 S.W.2d at 592.

Points I and II are denied.

### III.

 In Point V, the appellant claims that he received ineffective assistance of counsel in that his trial counsel refused

and failed to interview and call Brandon Wentworth as a witness at trial. He contends that Wentworth would have testified, if called, to the nature and extent of the injuries sustained by the appellant as a result of the bar fight with the victims and others, which would have corroborated his ineffective assistance of counsel claims with respect to the issues of self-defense or defense of others or the lesser-included offense of second degree assault.

▮ To prevail on a claim of ineffective assistance of counsel for failure to call a witness to testify, the appellant must show that the "decision 'involved something other than reasonable trial strategy; that the witness could have been located through reasonable investigation; that the witness would have testified; and that the witness' testimony would have provided the defendant with a viable defense.'" *State v. Gilpin*, 954 S.W.2d 570, 576 (Mo.App.1997) (citations omitted). Logically, appellant's trial counsel could not be convicted of being ineffective for failing to call Wentworth, whose testimony would have only supported one of the alternative trial strategies rejected by counsel. This is so in that the refusal or failure to call Wentworth was in keeping with counsel's trial strategy not to present the alternative strategies at trial, which we determined, *supra*, was reasonable, as found and concluded by the motion court. Thus, counsel's refusal to call Wentworth was itself a matter of reasonable trial strategy not subject to a claim of ineffective assistance of counsel. *Id.*

Point denied.

## IV.

▮ In Point VI, the appellant claims that he received ineffective assistance of counsel because his trial counsel "fail[ed] to request that the trial court address, inquire into, and rule on [his] 'Motion to Dismiss Attorney.'" In his *pro se* motion, the appellant sought to dismiss his appointed trial counsel, Ernst, and the appointment of substitute counsel. The appellant alleged that an irreconcilable conflict had arisen with Ernst, resulting in a complete breakdown of communication between them, such that he would be denied the effective assistance of counsel if he were forced to go to trial without substitute counsel.

In his point relied on, the appellant attacks, as ineffective assistance of counsel, the failure of his trial counsel to bring to the attention to the trial court his *pro se* motion for substitution of appointed counsel. In order to be successful on this claim, the appellant was required to satisfy the prejudice prong of the *Strickland* test by showing that the outcome of his case would have been different had his motion been brought to the attention of the trial court by his trial counsel. *Harris*, 870 S.W.2d at 814. Necessarily, whether or not appellant's trial counsel brought the appellant's motion to dismiss counsel to the attention of the trial court would not have had any effect on the outcome of his trial, unless the motion had been found to be meritorious and sustained by the trial court. This is so in that we will not convict the trial counsel of ineffective assistance for failure to engage in a futile act. *Redeemer*, 979 S.W.2d at 572. In this regard, the motion court found that the appellant's motion was without merit and "that if movant's Motion to Dismiss Attorney had been noticed up for a hearing the court would have denied [it]." Thus, even if appellant's trial counsel had noticed up the appellant's *pro so* motion to dismiss and substitute counsel for disposition by the trial court, as the appellant contends he was obligated to do, there was no reasonable likelihood that the outcome of his trial would have been any different, entitling the appellant to post-conviction relief.

▮ Although it is unnecessary for us to address whether the appellant's motion to substitute counsel was meritorious, if called upon to do so, we would find that it was not. Motions to substitute counsel are within the sound discretion of the trial

court. *State v. Williams*, 9 S.W.3d 3, 10 (Mo.App.1999) (citations omitted). "For the appellant to prevail on a claim of irreconcilable conflict with his counsel, he must show through objective evidence a ' "total breakdown in communication." ' " *Id.* A careful review of the record reflects that, although appellant claimed that there was a total breakdown in communications between trial counsel and himself, his counsel testified that they continued to talk "every day or every other day," until the trial. This does not evidence a total breakdown in communications. Merely disagreeing with the advice of counsel over trial strategy is insufficient to establish a total breakdown of communication requiring substitution of trial counsel. *State v. Denny*, 619 S.W.2d 931, 933 (Mo.App. 1981). Moreover, as discussed, *supra*, counsel testified at the post-conviction hearing that, while he and the appellant had many discussions, he did not recall any disagreements between them as to which defenses to present at trial. The motion court, in ruling on the appellant's motion, would have been free to believe this testimony in determining that the appellant's allegation of a complete breakdown in communications between trial counsel and himself was without merit. *State v. Stephan*, 941 S.W.2d 669, 676 (Mo. App.1997).

Point denied.

## Conclusion

The order of the motion court denying the appellant's Rule 29.15 motion for post-conviction relief, after an evidentiary hearing, is affirmed.

ULRICH and ELLIS, JJ., concur.